Brought on support of KCLE.com, 2-NT-0186, Building Big Rock, Lincoln, McKevitt. Linden and Sons Sewer, Water and Water. At Appel, Phoenix, Appelese. Also on behalf of Lincoln County, Mr. John R. Zamenkamp, for the memorable macabre of Phoenix, Appelese, and Daniel Penuska. Also on behalf of Phoenix, Appelese, Appelese, Appelese, Appelese. Gentlemen, are you ready to proceed? Yes. And you two have resolved the amount of time you will allocate? Yes, we have. Okay, fair enough. Proceed when you're ready then, Counselor. Thank you. May it please the Court. Again, my name is John Zamenkamp with the law firm Rapp, G. & Woodward, representing the plaintiff at Appel. In 1981, in an opinion decided by Illinois Supreme Court Justice Thunderwood, he pronounced the following, discovery is intended to be a mechanism for ascertainment of the truth. Here, the plaintiff did not have an opportunity to ascertain the truth for the benefit of the trial court, because the trial court ruled prior to allowing any discovery by the parties to flesh out the necessary facts and disputes in this case. So your opinion would be, even though it's a statutory statute of limitations issue, further discovery was necessary to flesh out what factors are you alluding to? Absolutely. All of the cases that we rely on, and in fact that defendants rely on, state that the issues in a statute of limitations, the defense to a statute of limitations defense are factual issues which have to be determined by the prior effect. So what, in your opinion, I mean, the trial court concluded, did it not, that the village knew or reasonably should have known that it was injured and the injury wrongfully caused. The damage is no later than October 21, 2013, the date on which the village sent a notice to Linden, declaring it in default under the contract and demanding identification of all failures, repairs, and threatening termination of the contract and litigation. So how would one not read that, at that point, they knew that these problems existed? Great question. And there is this defense to the statute of limitations argument called estoppel or equitable estoppel, and courts have applied that on numerous occasions to bar a statute of limitations defense. And I think that's really the crux of the issue in this dispute, is how the trial court applied the issue of estoppel in this case. And we believe they misapplied the law by relying on the case Vaughn v. Speaker. And I'd like to go into that briefly because Vaughn v. Speaker was decided in 1989 by the Illinois Supreme Court and laid out six elements for estoppel to apply. And Vaughn v. Speaker relied on a 1928 Illinois Supreme Court case which applied estoppel to a statute of frauds defense and it held that there has to be a misrepresentation or a concealment by the defendant for estoppel to apply. I was about to ask you that. So how did that exist here? Where's the concealment? Well, that's the great question because after Vaughn v. Speaker was decided in 1989, the majority of Illinois cases which have applied estoppel don't even use the Vaughn v. Speaker standards. They use the prior standards announced in the Illinois Supreme Court in the case Witherall v. Weinraub. And the Illinois Supreme Court ruled in the Jackson-Jordan Inc. case in 1994. Again, five years after Vaughn v. Speaker was announced that it's not necessary to allege misrepresentation or concealment. There just has to be some conduct by the defendant that the plaintiff reasonably relies on in order to extend the statute of limitations. And that conduct would have been what here? Well, here there are numerous instances of conduct that we lay out in our complaint and in some of the materials we submitted. First of all, Linden came in after the notice of default was sent. Linden immediately sat down and started negotiating with the plaintiff about repairs, the scope of repairs, and how they would be done. Linden, in fact, made repairs. This is a wastewater treatment system. There were 189 tanks on 189 different properties. Linden came in and repaired 189 of the service risers on these tanks on 189 different properties in an acknowledgment of fault and its need to remedy these defects. There were two service risers coming up from these tanks out of the ground. So Linden repaired 189 of one type of service riser. As to the other type of service riser, we allege this repeatedly that Linden contacted the manufacturer, found out how to solve that problem of the leaking riser, ordered a probe grouter, a special tool to make repairs, ordered materials to make the repairs, and led the village, the plaintiff, to believe that it would make repairs to these other risers. So after the default letter was sent in 2013, we had meetings and repairs started in 2014. These comprehensive... Counsel, let me ask you. Yes. Given that there's this 4-year statute of limitation, you've got to know that this clock is running. And so the concern that we see with this here is, why did you wait 5 1⁄2 years after you discovered what you, the village, called as widespread system failures? Wouldn't it have been prudent to file by April of 2017? Yeah, and that's a great question, and the issue in this case, and here's why it wasn't required. Because when a party makes acknowledgment of fault and starts making repairs and furtherance of the contract, that extends the statute of limitation and gives us, as the plaintiff, a defense to having to rush in and file a lawsuit. And when the party is negotiating with you, and in this case actually negotiating a lump sum payment in acknowledgment of their responsibility and making repairs, Illinois case law has said that's enough to toll the statute of limitations. Or at the very least, it's enough to create a factual issue that this should be remanded for discovery so we can flush these issues out. Is there any case law that you have that says the dependency of good faith negotiation is sufficient for estoppel? Negotiations in and of themselves is not enough for estoppel, at least according to one case. But there are cases we cite, and I can list them for you, that state that when it's unclear exactly what is necessary to cure defects and when steps are taken by the allegedly at-fault party to cure those defects, coupled with negotiations, that course of conduct taken together can be enough to toll the statute of limitations. Well, let's consider this from a certainty in the law standpoint. I mean, obviously one of the purposes of statutes is to provide some certainty in the law. So as I'm listening to your argument, it would almost have a chilling effect, wouldn't it, on negotiations and attempts to mediate the situation? Because then, if I'm the accompanying, if I'm Linden, I'm thinking, well, I'm not going to do anything because the statute is going to go on indefinitely. So you're causing maybe the contractor to say, okay, I'm not going to do any negotiations. You've got four years to file your lawsuit. I mean, it's sort of a slippery slope, isn't it, as to how much negotiations are going to work against you? I agree. It's very fact-specific and determinative. So in the case of, I think it's the senior housing in case, the first district case from 1989, I think negotiations went on and attempted repairs for eight years before the lawsuit was filed. Yeah. But even if the negotiations that was going on between the parties into 2016, we have correspondence that indicates that negotiation completely broke down by the fall of 2015. So wasn't that ample time still even after the negotiation completely broke down for the village to file the lawsuit? So let's say negotiations completely broke down in 2015 and that repairs, as we allege, repairs and efforts at making repairs ceased in 2015. That's when the clock starts. That's what the case law says. We filed this lawsuit in 2018. Within four years after negotiations broke down, discussions of a lump sum payment stopped and repairs, good faith efforts at repairs stopped. Now, again, we don't have to allege a stop hold, or we don't have to allege the discovery rule in our complaint. That's not a requirement under Illinois law. We just lay out the facts of default breach damages. Once a defendant raises the statute of limitation defense, then it becomes a factual inquiry whether there's any justification for pulling the statute of limitations, due to a stop hold, discovery rule, et cetera.  And misconstruing some of the facts in this case, which I can get to if you like, that I've got enough facts, I'm ruling as a matter of law. We think that's inappropriate. And so many of these cases, even the very case that the judge relies on, which is the Knox College case, in that case, the judge remanded the matter, the appellate court remanded the matter, I'm sorry, that's the Supreme Court case, remanded it to the trial court for determination of the essential facts. So essentially that's what you're asking for? It is. And I can point out instances where the trial court's statement of facts, alleged understanding of the facts, is incorrect. For example, it's stated that By October 21st, 2013, the plaintiff knew that Lyndon had performed some warranty repairs, but would not conduct full inspections or excavations or fraud-based job-wide repairs or replacements of all risers or electrical boxes. A statement like that is wrong in many respects, because the repairs didn't even start until 2014, and were finished in 2015. In 2015, other repairs were being negotiated, as well as a lump-sum payment. The electrical box issue, which was a latent, buried defect, wasn't even discovered by the plaintiff until 2016. Now, in this case, the defendants, they disputed liability, though, didn't they? They did, through the attorney. They pointed to the manufacturer as being the cause for the leaking risers, which is one part of the defect. I'm looking at this case, Lombard Company v. Chicago Housing Authority. You're aware of that? Yes. One of the grounds the court there found the equitable stopper was that the contractor there had never disputed liability. But that's different than our case, right? Well, yes and no. What's interesting here is you've got this juxtaposition between the posturing of the lawyers and the lawyer for the general contractor, Linden, saying, We're not at fault, we're not at fault. But what's actually happening, aside from the lawyer's letters, is that Linden is acknowledging fault by making repairs to 189 of these risers and ordering the specialized tool and materials to make repairs to 189 of the other risers. Let me ask you, the trial court ruled that the statute ran out on what date? At the latest, four years after the October 21, 2013, letter from the village was written. So sometime in October 2017? Correct. Were there any negotiations for repairs ongoing after that date? After 2017? No. We terminated the contract. The plaintiff terminated the contract by letter in 2016, because at that point repair efforts ceased and negotiations had ceased. I'm sorry. Everything stops in 2016? Yes. Other than us employing the manufacturer to make repairs that Linden had promised to do and had ordered, again, a specialized tool. But it was pretty apparent by 2016 none of these defendants were going to fix this. Correct. Another point, this is an underground system involving a small village. And when there were widespread system failures, meaning groundwater is getting into this system, which shouldn't be happening, and the village put the parties on notice, there were widespread system failures. The village didn't know exactly the full nature and extent of the problems because they were buried underground. There wasn't a full investigation by the parties, and the village was unable to determine causation or fault right away. Now, under the contract, before the contract can be terminated, and what the plaintiff reasonably believed was a requirement to initiating a lawsuit, we had to first send out a notice of default and provide the general contractor with seven days to cure the default. And if they failed to do so, then we could terminate the contract. So that's what the village did. Sent out in 2013 a notice of default identifying what it believes, even though there's no thorough investigation done, were problems with the system and demanding it fixed within seven days. And so what happened? Linden ran in, negotiated with the plaintiff, started making repairs, promised to make other repairs, and that basically stopped the plaintiff. The plaintiff relied on that and did not terminate the contract. It waited until the negotiations. How does terminating the contract help you at all? The work was completed at that point. The only thing you were addressing by terminating the contract was the warranty. The one-year guarantee period, which says you have to make repairs that are discovered within the one-year guarantee period. And we believe that, I think it's a reasonable reading of the contract, that when you say there are defaults, when there's defects that are discovered within the one-year guarantee period, we have to put you on notice and give you an opportunity to cure those before we can terminate the contract. Otherwise, the defendant Linden would be running in and saying, you just filed a suit, you never put us on notice, you never gave us an opportunity to cure within seven days or a longer time period, and this lawsuit is premature. And that's what we were protecting against. Any other questions? I'm sure you'll have a chance for a reply. Do you wish to respond? Good morning, Your Honors. Good morning. May it please the Court? Okay, well, I'm going to approach this appeal, I think, perhaps a little bit differently than the co-defendant. But essentially, there's not that many issues against applied technologies in this case. Okay? Plaintiff does not raise anything about equitable tolling or contractual tolling or repair doctrine tolling. None of that is against... By the way, could you identify yourself for the record? Oh, sorry. Daniel Hanuska for applied technologies. Okay. So none of that's raised against applied technologies. There's just a very narrow, limited discovery rule argument against applied technologies. And even that is limited because plaintiff does not challenge that the statute of limitation bars the 2013 riser defects. So the riser defects related to the 12-inch and 24-inch risers, the bad epoxy work that was done on the risers, the improper sealing of the waterproofing of the risers to the tanks, none of that is being argued. So plaintiff's limited discovery rule argument is very narrow. And basically it's only saying this, that post-2013 barrier defects should be tolled under the discovery rule all the way to 2016. And that's a very problematic proposition, I think for very obvious reasons. Because essentially by doing that, by tolling the statute of limitations for these post-2013 defects, it's basically assigning a statute of limitations timer, you can say, to each and every subsequently discovered defect. Right? And so that would basically violate the entire point of the statute of limitations under construction. It would create indefinite liability because nobody would want to— there would be a lot of uncertainty in the businesses, right? So that's the problem with ignoring what plaintiff knew about in 2013 for the benefit of what it later found out that was buried defects. But also that argument goes against the weight of the case. And really that argument was tried already in the second district. The same discovery rule argument that plaintiff's now bringing to this Court has been tried in this district already, and it was rejected. So in a sense, this is part two. It's a sequel, right? And the first case that that was dealt with is called the Freeport case. And I cite that on page 20 of my brief. But before I get into the Freeport case, I do want to make this point in the limited time that I have. I don't think the Court even has to address the discovery rule argument as to applied technologies because I think—and I don't think this is a petty point, I think it's a very important point— that there's substantial noncompliance with Supreme Court Rule 341H7. Okay? And 341H7 governs—you know, gives us the recipe, in a sense, of what's supposed to be an appellate argument, right? You have to cite the record, you have to cite some case law, and you have to make an analysis of all—bringing it all together, right? And a simple point I just want to make as to the 341H7 requirements is this, that this Court has within its power to deem forfeit the argument of plaintiff. I think it has enough to deem forfeit the argument of plaintiff to everything, but certainly as to applied technologies. Because when the consequences of noncompliance with 341H7 caused difficulty, hindrance in reviewing the record, I know there were some problems for applied technologies in knowing what was argued against it because there was nothing argued against it. There was nothing. There was no case law. There was no citation to the record. So— Although you're aware of the fact that forfeiture is a limitation on the parties, not the Court. We could ignore that argument. Absolutely.  I'm just letting the Court know that because it created these difficulties, it's an option for the Court. Let me ask you this. Obviously at some point, I believe probably within a day or two of the alleged defects, ATI and Linden sent our representatives to inspect the sewer system and all the failures, right? Right. So did ATI then engage in the so-called negotiations for a while with the village? Or what happened? What was ATI's role? My understanding from the record is that ATI kept its distance. It didn't engage in any repair participation. I think it did the initial inspection. But that was it? That was it. That's my understanding, yes. And that brings up a good point, though, with the Freeport case. So the second district case, Freeport, right, was confronted with the same discovery rule argument that plaintiffs now bring in, that there was two inspections in the Freeport case, okay? The first inspection did not uncover all the defects to the construction of the project. And so in the Freeport case, there was an addition built to a hospital, and there was leakage, there was brick crack going down, et cetera. And the first inspection that was done with the plaintiffs in Freeport did not uncover the full extent of the damage. The inspectors could not get past this. It wasn't really a brick wall. It was like a brick, just a brick, I guess almost like a brick wall. They couldn't get behind it to see where the leakage was coming from and the defects. And the defendants in the Freeport case gave a letter to the plaintiffs, saying this is what we think the problem is. We advise that you get a second inspection because we can't find out the full extent of your damage. We can't get behind that brick wall, that bricked-off portion of the addition. And so the plaintiffs in Freeport waited two years to get the second inspection. After that second inspection, they did hire a masonry contractor that was able to get behind that brick wall to find out where the leaking was coming from, the full extent of the damages. It uncovered structural defects, if I recall. And the plaintiff was going to argue that the statute of limitations should be told to the second inspection. And this district rejected that argument. And so in closing, Freeport stands for the following proposition. That knowledge of additional construction defects does not tell the statute of limitations. When a plaintiff already knows the construction is defective, right? Some manner, at least. Right, some manner. And then the plaintiff already knows of at least one potential defendant. And the plaintiff provides no good excuse of why it wasn't proactive to ascertain the full extent of its damages within the four-year statute of limitations period. Well, I guess in Freeport it was a different statute of limitations at the time. Subsequently amended. But in short, the October 25th letter from a plaintiff to Applied Technologies, that is absolutely key. And that will touch up on all the elements of the discovery rule, the construction statute, and it's the perfect letter for the Freeport case. So I encourage your honors to take a look at that letter to Applied Technologies. Thank you. Do you have any questions? No. Any other questions? Any questions? Thank you very much. Thank you very much. Good morning, honors. I'm here for H. Linden and Sons and North American Specialty. North American Specialty was the surety for Linden on this project. I don't believe there is any question based on the record before this Court that Judge Murphy was not correct in determining that the statute of limitations began to run no later than October 21st, 2013, which is today. Counsel, let me ask you. Sure. So it is your position that the statute of limitation ran out in October of 2013, correct? It ran out. It began to run, Judge. The four years later, say, October 21st of 2017 would be the expiration date. And when looking at the record in this case here where I see there is this ongoing letters between the two law firms that were involved, your law firm representing Linden and the village, and I see where in one of the letters written in July of 2015, it was Linden's position where you say, We remain ready, willing, and able to begin work as soon as the scope of the work of the disputed items is agreed to and requested, information has been fulfilled. And so my question is, is that doesn't this correspondence in 2015 show ongoing negotiations? It does show ongoing negotiations. But I think, as your question earlier, is that enough to create a stop-all? And I submit to the Court that it's not enough to create a stop-all. If you look at the record and look at the letters that the village itself issued, they recount how when Linden was first advised of the widespread failures, its initial reaction was to deny liability. So in April 2013, it was denying liability. In May of 2013, the village made a claim on the warranty. In May 16th, and it was in October where a default occurred. Now, a default is serious. It's not just a breach or a series of breaches. It's serious enough of a breach to warrant termination, and that's what the letters said. Because Linden was denying liability, that set up a negotiation where one side said, I'm not liable. The other side says you are. That forges settlements, as we all know. And why are settlements done? To avoid the unnecessary expense and peril of litigation. Well, counsel, that was obviously Linden's initial position. So the question becomes, did Linden ever acknowledge liability? No, it did not, Your Honor. It never acknowledged liability. Its position was constant and steadfast throughout. We're not liable. But we're willing to talk to you about certain repairs. Because you can see his point. If Linden had tacitly acknowledged or conceded some liability, that could be something that could be argued to toll reducing them to go along with it. But you're saying the record's clear. You've never acknowledged liability. That's correct, Your Honor. The fact that we may acknowledge that we're willing to repair some items is not an acknowledgement of liability. It's an acknowledgement that if we get into court, there's uncertainty in expense associated with that. If you consistently denied liability, why did you order material in 2014 and possibly 2015 to repair the 12-inch tank risers? Because Linden believed that if they could do that, they could appease the village and they could cut their losses and reduce their expenses. Still denying liability. Exactly, Judge. Exactly. This is not unusual in the construction situation. The case that I think Your Honor talked about, the Lombard case, where the Chicago Housing Authority constantly reassured the contractor that we are going to pay all these extra charges and kept reassuring them and kept reassuring them, and then the statute ran out. And then they said, we're not paying. It seems that being different than what you're saying. Yes, it's much different. There was another case, I think it was the, I'm sorry, it escaped me where the contractor kept reassuring the owner that we've got your back, we're going to cure these defects. The contractor goes out and hires an expert to help it. And then the statute runs out and the contractor says, oh, I can't fix it too bad. Well, in those cases where there was reassurances given to the plaintiffs in those cases, yes, estoppel applied. And I would note that estoppel and tolling are two different things. The village seems to conflate the two by saying that, you know, if we enter into negotiations or there's a period of time where the contractor acknowledges liability and then switches positions before the statute runs, there's a tolling. Well, it's not, tolling is different from estoppel. You see estoppel cases where the statute has completely run out and a suit is filed, and then they raise the statute limitations, and the court's saying, because of your conduct, you can't raise that. And I think here where negotiations broke down two years, over two years before the statute ran, the village did not file suit. In fact, they waited over three years to file suit. And under those circumstances, there is no reason that estoppel should be applied in this case based on this record. Now, the village suggests that we were denied discovery in this case, but the village never asked for discovery before the trial court. And if the village believed it needed discovery on the statute of limitations issues, it could have filed a motion before Judge Murphy for such discovery. It didn't do that. What it chose to do was file an affidavit of its village president and the various correspondence and e-mails that Your Honor referred to as support for its position. And it believed in the trial court that that was sufficient. It never said to the trial court, I haven't had discovery yet. You can't rule on this. That was never argued in the trial court. And I would note that the estoppel argument is only directed to Linden. They tried to conflate it with the surety, but the surety never was out there. They never had communications with the surety until after the termination letter. And the surety wrote to the village and said, we are undertaking an investigation of your claim subject to a full and complete reservation of rights. Let me ask you this. Because of the nature of the service that was being provided under this contract by Linden and ATI, any defects related to the service risers, electrical boxes, or conduits, they were not readily observable by the village. Is that correct? I won't listen. For purposes of the case here, Judge, because that's in the complaint, the court has to take those allegations. Okay. And what I was going to get at is the village alleged in its complaint that it discovered those issues in 2016 with respect to the electrical boxes because they were not properly sealed. So why shouldn't the village have until 2020 to file suit regarding those defects? I think if you go back to the Freeport Hospital case that counsel mentioned, the cases say that when you discover an injury, the clock starts to run. Now, in the trial court, we said to Judge Murphy, you could have picked April of 2013 as the trigger date because that's the date that they said they discovered. It was their word in their complaint, discovered these widespread failures. I meant in their brief, Judge. So it could have started then, but we picked the date of default. And the cases say you don't even have to know whether your injury is actionable. You just got to know something's wrong. Like a roof leak. Roofs aren't supposed to leak. And then you have a period of investigation to figure out why. Thank you, Your Honors. Thank you. As to the assertion that we never asked for discovery, true. We never filed a motion asking for discovery. What we told the trial court in the course of responding to the motions to dismiss were that these are factual issues and discovery is warranted. And here's all the case law where dismissals by trial courts were remanded so that discovery could occur. And that's how we asked for discovery in this case. And what the judge did was issue a memorandum of opinion after oral arguments, granting the motions to dismiss and effectively foreclosing discovery. You mentioned the surety. And it's our position we don't have to. We allege that the surety is liable because they stand in the shoes of the contractor when there's a default and a failure to perform. We don't have to allege that the surety took any specific actions to induce estoppel, et cetera. If Linden's liable as the defendant, then the surety's liable. You asked questions about the electrical boxes, and counsel stated, well, once we knew there was a problem, we had a duty to investigate everything. And that's true to a certain extent. The widespread system failures involve water infiltrating the system. And there was no way of knowing that the problem with the electrical box is not being sealed. Just even an inspection of the system I don't think would have uncovered that. They were buried within the tanks. The wires were buried within the conduit. And that was not discovered until 2016. The essential point, though, and I know we've gone back and forth on this, is whether the defendant Linden's denial of liability through their attorney jives with what their actual practice was. And that's the factual determination that's at the heart of this matter that we never got to get to. Because if they're denying liability on one hand, they weren't merely taking some steps to try and settle this case. They were implicitly acknowledging liability by saying, we're going to undertake extensive repairs on 189 different properties to repair vices. With regard to ATI, we don't allege a SOPL against ATI, the defendant who's the engineer in this case. We simply allege that the statute of limitations should be told due to the discovery rule. And that's because we had parties pointing the finger at each other. We had the manufacturer pointing the finger at the engineer and the general contractor, and the engineer thinking it was reasonable to adopt Linden's position that there could be a problem with the epoxy supplied by a supplier as causing these defaults or defects. And the village simply did not know and demanded that the parties perform an inspection so we could determine the root of the problem. But the problems with the service risers, again, these aren't on the tanks that were on cover that we knew about and that Linden took efforts to repair. The service risers were on the mains, like in the public rights-of-way. And one of those broke, and the village was curious as to why one broke. And it didn't appear that it was attached properly, but they didn't dig up all 180 service risers to figure that out. And it wasn't until more started breaking over time, and we did dig some up and repair them, and got an opinion from the manufacturer that notified ATI in the year 2016 that it appears that you engineered these service risers just so a pipe sits on a pipe without a mouse hole and the pipe getting inserted and being secure. And what was happening was they were just snapping off. So, again, that was a latent, varied defect, and there's case law that says that a latent, varied defect, again, is a factual issue, but our grounds for tolling the statute of limitations, and that's our primary argument for tolling against ATI. And I'd point to the Bradley v. Alpine case, the 1991 case that we cite, where there was an I-beam constructed within a house that was completely buried and wasn't discovered until later after the statute had run. And the court there said, well, wait a minute. The contractor who improperly did this work can't hide behind the statute of limitations where the work was buried and not readily discoverable. Any questions? Thank you very much. We are adjourned for the day, and the decision will be rendered in due course.